UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

AARON BONDAROFF,

        Plaintiff,

   - against -

ANYTHING CORP. and KIERNEN COSTELLO,

        Defendants.

------------------------------------------------------------------- x

Civil Action No. 07 Civ. 7952
(JES)

DEFENDANTS' ANSWER
AND COUNTERCLAIMS

JURY DEMAND

Defendants Anything Corp. ("AC") and Kiernen Costello ("Costello" or together with AC "Defendants") by their attorneys, Clifton Budd & DeMaria, LLP, as and for their answer to the complaint ("the Complaint"), herein brought by plaintiff Aaron Bondaroff ("Bondaroff" or "Plaintiff") and their counterclaims against Plaintiff, allege, upon information and belief, as follows:

1.   Neither admit nor deny the allegations in paragraph 1 of the Complaint that this action asserts claims under various legal theories as they consist entirely of legal conclusions and make no factual allegations, but deny that Defendants violated any laws, infringed any rights of Plaintiff or converted or misappropriated any trade-name or property of Plaintiff, or that Bondaroff suffered any damages, and further aver that Plaintiff has breached fiduciary duties to Defendants, breached his contract with Costello, infringed Defendants' trademarks, defamed Defendants, and tortiously interfered with Defendants' contracts and business relationships.

2.    Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint, except admit that Plaintiff has also been known as "A-Ron".

3.    Deny each and every allegation contained in paragraph 3 of the Complaint, except deny having knowledge or information sufficient to form a belief as to the allegations contained in paragraph 3 concerning the article annexed to the Complaint as Exhibit B.

4.    Deny each and every allegation contained in paragraph 4 of the Complaint, except admit that Costello and Bondaroff agreed to form a company and that each of them would be 50% owners of such company.

5.    Deny each and every allegation contained in paragraph 5 of the Complaint.

6.    Deny each and every allegation contained in paragraph 6 of the Complaint.

7.    Neither admit nor deny that Plaintiff seeks to enjoin this activity and damages as it consists entirely of legal conclusions and makes no factual allegations, but deny that Defendants have undertaken the activities alleged by Plaintiff and deny that Plaintiff has been damaged by Defendants.

8.    Neither admit nor deny the allegation that this Court has exclusive subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1338 as it consists entirely of legal conclusions and makes no factual allegations and denies having knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 8 of the Complaint.

9.    Admit the allegations contained in paragraph 9 of the Complaint.

10.    Deny each and every allegation contained in paragraph 10 of the Complaint, except admit that Costello works and resides in the Southern District of New York.

11.    Admit that venue is proper as the Defendants are present, and the events alleged in the Complaint are alleged to have taken place, within the Southern District of New York.

12.    Admit the allegations contained in paragraph 12 of the Complaint.

13.    Deny each and every allegation contained in paragraph 13 of the Complaint, except admit that Costello works at the AC store located at 51 Hester Street, New York, NY.

14.    Deny each and every allegation contained paragraph 14 of the Complaint, except admit that AC is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 51 Hester Street, New York, NY.

15.    Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of Complaint, except deny that Bondaroff has expended considerable time and effort since June 2006 in developing and branding the trade-name "aNYthing" and associating that trademark with any clothing.

16.    Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Complaint.

17.    Deny having knowledge or information sufficient to form a belief as to the allegations contained in paragraph 17 of the Complaint.

18.    Deny each and every allegation contained in paragraph 18 of the Complaint, except admit that in 2004 Costello proposed that he and Bondaroff form a company to sell tee shirts and other clothing items, including items bearing the name aNYthing, that Bondaroff was to own 50% of the company, that Costello would have principal responsibility for sales, production, and day to day management, while Bondaroff would have responsibility for marketing and promotion of the company.

19.    Deny each and every allegation contained in paragraph 19 of the Complaint.

20.    Deny each and every allegation contained in paragraph 20 of the Complaint, except admit that AC was formed in or about 2004 and that it used the trade name "aNYthing."

21.    Deny each and every allegation contained in paragraph 21 of the Complaint, except admit that Costello and Bondaroff went to an attorney to draft a shareholder agreement, that a draft agreement was reviewed and that it contemplated the licensing of the trademark "aNYthing" to AC.

22.    Deny each and every allegation contained in paragraph 22 of the Complaint, except admit that Bondaroff initially rejected the draft agreement solely because it failed to address Bondaroff's salary and partial rent to be paid to him by AC, and Defendants further aver that Costello and Bondaroff subsequently agreed to salary and partial rent terms, reaching an agreement on 50/50% ownership in AC in mid-2004.

23.    Deny each and every allegation contained in paragraph 23 of the Complaint, except admit that Costello caused AC to file a certificate of assumed name with the New York Secretary of State and further aver that such filing was done only after Costello and Bondaroff agreed that, in consideration of Costello investing an additional $150,000 in AC to pay for the lease and build out of the AC retail store, the mark would be owned by AC.

24.    Deny each and every allegation contained in paragraph 24 of the Complaint, except deny having knowledge or information sufficient to form a belief as to the truth of the allegation that Bondaroff was unaware of the filing of the trademark application and further aver that Bondaroff had previously agreed that AC could file the application for the trademark as the owner of same.

25.    Deny each and every allegation contained in paragraph 25 of the Complaint.

26.     Deny each and every allegation contained in paragraph 26 of the Complaint, except admit that with Bondaroff's consent and active participation, Bondaroff and Costello developed the AC website to advertise its products under the trademark "aNYthing."

27.     Deny each and every allegation contained in paragraph 27 of the Complaint, except admit that AC has sold articles of clothing through the website.

28.     Deny each and every allegation contained in paragraph 28 of the Complaint.

## AS TO THE FIRST CLAIM FOR RELIEF

29.     Repeat and reallege each and every allegation, admission and denial contained in paragraphs "1" through "28" of this Answer with the same force and effect as if fully set forth at length herein.

30.     Deny each and every allegation contained in paragraph 30 of the Complaint.

31.     Deny each and every allegation contained in paragraph 31 of the Complaint, except admit that pictures of Bondaroff have been placed on the AC website by Bondaroff.

32.     Deny each and every allegation contained in paragraph 32 of the Complaint.

33.     Deny each and every allegation contained in paragraph 33 of the Complaint.

34.     Deny each and every allegation contained in paragraph 34 of the Complaint.

35.     Deny each and every allegation contained in paragraph 35 of the Complaint.

36.     Deny each and every allegation contained in paragraph 36 of the Complaint.

## AS TO THE SECOND CLAIM FOR RELIEF

37.     Repeat and reallege each and every allegation, admission and denial contained in paragraphs "1" through "36" of this Answer with the same force and effect as if fully set forth at length herein.

38.     Neither admit nor deny the allegations contained in paragraph 38 of the Complaint as it consists entirely of legal conclusions and makes no factual allegations, and refer Plaintiff to New York General Business Law Section 133 for its contents.

39.     Deny each and every allegation contained in paragraph 39 of the Complaint.

40.     Deny each and every allegation contained in paragraph 40 of the Complaint.

41.     Deny each and every allegation contained in paragraph 41 of the Complaint.

## AS TO THE THIRD CLAIM FOR RELIEF

42.     Repeat and reallege each and every allegation, admission and denial contained in paragraphs "1" through "41" of this Answer with the same force and effect as if fully set forth at length herein.

43.     Neither admit nor deny the allegations contained in paragraph 43 of the Complaint as it consists entirely of legal conclusions and makes no factual allegations, and refer Plaintiff to New York General Business Law Section 360-1 for its contents.

44.     Deny each and every allegation contained in paragraph 44 of the Complaint.

45.     Deny each and every allegation contained in paragraph 45 of the Complaint.

46.     Deny each and every allegation contained in paragraph 46 of the Complaint.

47.     Deny each and every allegation contained in paragraph 47 of the Complaint.

48.     Deny each and every allegation contained in paragraph 48 of the Complaint.

## AS TO THE FOURTH CLAIM FOR RELIEF

49.     Repeat and reallege each and every allegation, admission and denial contained in paragraphs "1" through "48" of this Answer with the same force and effect as if fully set forth at length herein.

50.    Deny each and every allegation contained in paragraph 50 of the Complaint, except admit that Costello, acting on behalf of AC, caused a certificate of assumed name to be filed with the New York Secretary of State in the name of AC.

51.    Deny each and every allegation contained in paragraph 51 of the Complaint, except admit that Costello, acting on behalf of AC and with Bondaroff's consent, caused a Federal trademark application to be filed with the United States Patent and Trademark Office in the name of AC for the mark "aNYthing."

52.    Deny each and every allegation contained in paragraph 52 of the Complaint, except admit that AC's trademark application correctly stated that AC is the owner of the mark "aNYthing", that it had the right to use the mark, and that to its knowledge and belief, no other person, firm, corporation, or association has the right to use the mark in commerce.

53.    Deny each and every allegation contained in paragraph 53 of the Complaint.

54.    Deny each and every allegation contained in paragraph 54 of the Complaint.

55.    Deny each and every allegation contained in paragraph 55 of the Complaint.

## AS TO THE FIFTH CLAIM FOR RELIEF

56.    Repeat and reallege each and every allegation, admission and denial contained in paragraphs "1" through "55" of this Answer with the same force and effect as if fully set forth at length herein.

57.    Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 57 of the Complaint.

58.    Deny each and every allegation contained in paragraph 58 of the Complaint, except admit that Defendants, in conjunction with Bondaroff, have allowed Bondaroff to place photographs and video of Bondaroff on AC's website.

59.     Deny each and every allegation contained in paragraph 59 of the Complaint.

60.     Deny each and every allegation contained in paragraph 60 of the Complaint.

61.     Deny each and every allegation contained in paragraph 61 of the Complaint.

## AS TO THE SIXTH CLAIM FOR RELIEF

62.     Repeat and reallege each and every allegation, admission and denial contained in paragraphs "1" through "61" of this Answer with the same force and effect as if fully set forth at length herein.

63.     Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 63 of the Complaint.

64.     Deny each and every allegation contained in paragraph 64 of the Complaint, except admit that Defendants, in conjunction with Bondaroff, have allowed Bondaroff to place photographs and video of Bondaroff on AC's website.

65.     Deny each and every allegation contained in paragraph 65 of the Complaint.

66.     Deny each and every allegation contained in paragraph 66 of the Complaint, except admit that AC has sold clothing and other items through its website.

67.     Deny each and every allegation contained in paragraph 67 of the Complaint, except admit that AC has sold clothing and other items through its website.

68.     Deny each and every allegation contained in paragraph 68 of the Complaint.

69.     Deny each and every allegation contained in paragraph 69 of the Complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

70.     Upon information and belief, prior to the formation of AC, Bondaroff had only used the mark "aNYthing" as decorative artwork on tee shirts and Bondaroff had not used it as a trademark to identify a brand or source of goods or services.  AC was the first entity to use the

mark as a trademark, identifying AC's company name, brand of clothing, and the AC store, such that AC is the senior user of the mark as a trademark, giving it a right to continued use of the mark.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

71.    In or about December 2005, in order to induce Costello to invest additional capital into AC in order to lease and build out its first retail store, and to prevent any reduction in Bondaroff's 50% ownership interest in AC despite Costello's additional investment, Bondaroff agreed that the mark "aNYthing" was the sole property of AC and Bondaroff assigned any rights he previously claimed to have had in the mark to AC.

72.    In reliance on Bondaroff's renunciation of any rights to the mark and his assignment of the mark "aNYthing" to AC, Costello managed the leasing, design, build out, and merchandising of the Hester Street Store and contributed $192,000 in additional capital to fund the AC store.

73.    In further reliance on Bondaroff's renunciation of any rights to the mark and his assignment of the mark "aNYthing" to AC, Costello continued to invest hundreds of thousands of dollars into AC.

74.    Accordingly, Bondaroff no longer has any rights or ownership in the mark "aNYthing."

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

75.    Bondaroff was aware of, and consented to, Defendants' use of the mark "aNYthing" since 2004.  Accordingly, Bondaroff's claims are barred by acquiescence.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

76.    Bondaroff was aware of, and consented to, Defendants' use of the mark "aNYthing" since 2004.  Accordingly, Bondaroff's claims are barred by laches.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

77.    Bondaroff was aware of, and consented to, Defendants' use of the mark "aNYthing" since 2004, and to Defendants' continued investments in AC and the mark. Accordingly, Bondaroff's claims are barred by estoppel.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

78.    Upon information and belief, Bondaroff has not used the mark "aNYthing" in commerce since the formation of AC in mid-2004.  Accordingly, to the extent Bondaroff had any rights to the mark, his claims based upon such rights are precluded by his abandonment of the mark.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

79.    Plaintiff's claims are barred by the doctrine of unclean hands.

## AS AND FOR DEFENDANTS' COUNTERCLAIMS

### JURISDICTION AND VENUE

80.    The Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 1367 and 15 U.S.C. § 1121.

81.    Venue lies within the Southern District of New York pursuant to 28 U.S.C. § 1391(b) in that both Bondaroff and Costello reside within this District and a substantial part of the actions giving rise to these counterclaims occurred within the District.

## FACTS COMMON TO ALL COUNTERCLAIMS
### Formation of AC

82.     AC is a domestic corporation incorporated in 2004.  The principal business of AC is the sale of clothing, accessories, and other products under the trademark "aNYthing" pronounced "A New York Thing".

83.     Prior to the incorporation of AC, Bondaroff had worked as a salesperson at a skateboard retailer in Manhattan.  While working for the skateboard retailer, Bondaroff also designed and sold tee shirts and sneakers for his own account with decorative artwork to a few customers but lacked capital and resources that he would need to make a profit from the sale of decorative clothing.  In early 2004, Bondaroff owed $5,000 to his tee shirt vendors and he incurred an additional $5,000 in debt because he was unable to sell a large quantity of back stock sneakers.

84.     In early 2004, Costello, a friend of Bondaroff, had seen potential in marketing Bondaroff's downtown persona and the sale of decorative tee shirts, believing that the tee shirts could be expanded into a brand of merchandise.

85.     It was agreed between Costello and Bondaroff that they would form a corporation to do business under the trade name of "aNYthing" (pronounced "a New York thing") and sell clothing, accessories and other products under the trademark "aNYthing."  They further agreed that Costello would serve as Managing Director, Treasurer and Secretary with principal responsibility for sales, production, and day to day management, while Bondaroff would represent the corporation as the personality of the brand, having the title of President, but functionally Bondaroff was in charge of promoting aNYthing as the representative of the brand,

as well as in charge of creating new products.  AC was formed pursuant to the agreement set forth herein.

86.    In consideration for Costello's 50% ownership interest in AC, Costello and Bondaroff agreed that Costello would contribute $125,000 in capital to AC, $10,000 of which would be used to pay off Bondaroff's then outstanding debt.  It was also agreed that Bondaroff would receive the first $25,000 of profit from AC.  Costello, in fact, contributed in excess of $125,000 in capital to AC and paid off Bondaroff's $10,000 debt.

87.    In consideration for Bondaroff's 50% ownership interest in AC, Bondaroff agreed to serve as the personality of the brand, actively promoting its products.  In further consideration of acquiring a 50% interest in AC, Bondaroff agreed that AC would have exclusive use of the "aNYthing" artwork and trademark and agreed to create new art and other products for AC to sell under the "aNYthing" trademark.  Bondaroff and Costello agreed that AC would have the exclusive right to use the aNYthing trademark for the life of the corporation.

88.    Since it was unlikely that the start up corporation would earn a profit for its shareholders, Bondaroff also required a salary of $700 per week and a monthly payment of $1,000.  The monthly payment was the equivalent to one half of the rent on Bondaroff's apartment since the fledgling business was run out of Bondaroff's apartment and was using approximately one-half the space.  AC also paid Bondaroff's monthly utility, phone and cable television bills, totaling around $7,000 per year.  Bondaroff had a company credit card for charging company expenses, yet Bondaroff would frequently also charge his own personal expenses to the card, totaling approximately $30,000.  Bondaroff failed to reimburse AC for any of these personal expenses which included charges for restaurants, movie tickets, clothing, alcohol and rental cars.

89.    Since the formation of AC, Bondaroff has received in excess of $200,000 from AC, including his salary, rent, utilities, phone, cable and personal expenses.  During the same period of time, Costello has received less than one quarter of that amount from AC, and Costello contributed in excess of $600,000 in capital.

90.    AC started operations in mid 2004.  In the six month period ending in December 2004, AC had received $90,000 in revenue from merchandise sales to ten to fifteen wholesale accounts.

91.    In 2005, the AC business started to expand, with sales increasing to $365,000 to existing and new accounts.  Costello worked to find new customers for the aNYthing product line and to find new production sources, as well.

92.    As the personality promoting the aNYthing brand, one of Bondaroff's main responsibilities was to promote the brand through the media and through concerts and other social events.

### The Assignment Agreement and AC Store

93.    While the business was expanding exponentially, largely as a result of Costello's time, effort, and capital, the new operation still required a significant investment and was operating at a loss in mid-2005.  Nevertheless, Bondaroff and Costello agreed that if the aNYthing brand was to continue to expand and grow it would need a retail outlet to promote the brand in the New York marketplace.

94.    Costello and Bondaroff located a retail space on Hester Street in lower Manhattan. The cost of renting and building out the retail space on Hester Street was estimated at between $100,000 and $150,000.  Although Bondaroff had no additional capital to contribute to AC to

fund the retail outlet, Costello agreed to contribute the extra capital needed for the store and to personally oversee the leasing, design, build out, and selection of merchandise for the retail store.

95.     Costello agreed to contribute an additional $150,000 in capital to AC without adjustment of the 50/50% ownership in AC, provided that Bondaroff agreed to assign all rights to the trademark aNYthing to AC.

96.     Bondaroff assigned the trademark aNYthing to AC and Costello made additional capital contributions of $192,000 in the second-half of 2005.  In further consideration of Costello contributing excess capital, Bondaroff agreed to be present at the store several days a week and to promote the retail store as Bondaroff's store.

97.     In reliance upon assignment of the mark, Costello contributed additional capital contributions of $300,000 in 2006 and continues to contribute capital.

98.     AC filed an application with the United States Patent and Trademark Office ("PTO") for registration of the mark "aNYthing," with Bondaroff's prior consent.  No final determination as to the registrability of the mark had been made to date.

99.     AC uses the aNYthing mark in commerce through the sale of long and short-sleeved tee shirts, sweatshirts, hats and other apparel under the aNYthing trademark.  Many of the items sold under the aNYthing trademark bear the aNYthing artwork, as well.  The mark is also used on AC's storefront and AC's website.  Other uses or planned uses of the aNYthing mark include music, book publishing, movies and videos.

100.     After the expenditure of many hundreds of hours work by Costello and the $192,000 in capital needed for the store, the retail store opened under the name "the aNYthing Store" in December 2005.

101.    By mid-2006 the store and the aNYthing brand had achieved dramatic increases in sales and were the subjects of several favorable articles in the trade and popular press, and twice were prominently featured in articles in the New York Times, including a cover story in the July 30, 2006 New York Times Sunday Magazine.  In interviews for these articles, Bondaroff refers to himself as the owner of AC and the store since he was to be the representative of the store and brand to the general public.

**Bondaroff's New Venture**

102.    In the latter half of 2006, Bondaroff stopped attending to his marketing and promotional duties for AC and was no longer present at the store.  He began devoting substantial time and effort to a new venture unrelated to AC, a nightclub known as 205 Chrystie.  Upon information and belief, Bondaroff is the creative director of 205 Chrystie.

103.    In late 2006, Bondaroff began seeking media attention for the nightclub at the expense of AC.  When Bondaroff was confronted by Costello about his failure to promote AC as he promised, Bondaroff advised Costello that Bondaroff had "lost interest" in AC and the aNYthing store.

104.    In early 2006, AC also started making internet sales through its website www.anewyorkthing.com.  The website also contained AC's blog known as the "Glob".  Bondaroff's responsibilities included his making daily contributions to the blog.  However, in late 2006, Bondaroff also failed to update the blog daily as required.  Instead, he started using the AC blog to promote his new venture 205 Chrystie.

**Growth of AC**

105.    Despite Bondaroff's inattention to the business in late 2006, largely through Costello's efforts with respect to the new store and internet site, AC's sales in 2006 more than

doubled sales in 2005 with $550,000 in wholesale sales to sixty accounts, $240,000 in retail sales from the store and internet sales of $75,000, totaling $865,000.

106.    Through loans and personal investments, Costello continued to invest in AC. By the end of 2006, Costello directly, and through loans from family members, had invested more than $600,000 in AC. AC operated at a loss in 2004 and 2005. AC finally broke even in 2006 and was projecting its first annual operating profit in 2007. The aNYthing brand had achieved wide notoriety in the press and sold more than $1,300,000.00 in merchandise since it started up in mid-2004.

**Bondaroff's Attempt to Sell AC Without Costello's Consent**

107.    In early January 2007, Bondaroff approached Costello and advised him that he no longer wanted to be partners with Costello and that he wanted Costello out of the business. Without Costello's knowledge or consent, Bondaroff had been negotiating with unidentified investors to purchase Costello's 50% interest in AC for less than $100,000.

108.    Costello informed Bondaroff that he would never sell his 50% of AC for $100,000, especially since AC was finally turning profitable and since Costello's capital investment in AC already exceeded $600,000. Bondaroff warned Costello "not to get in his way" by refusing to take the deal Bondaroff and his undisclosed investors would be offering or Costello "would be left with nothing."

109.    Costello sought a meeting with Bondaroff's investors to see whether a more equitable deal could be negotiated; however, Bondaroff refused to identify the investors by name or assist in arranging a meeting.

**Bondaroff's Withholding of AC Information and Property**

110.    After his unsuccessful attempt to force out Costello, Bondaroff refused to undertake any further responsibilities on behalf of AC and even denied Costello with access to AC's business records which were stored in Bondaroff's apartment.    Bondaroff also began withholding information from Costello regarding AC's financial records, bank statements, tax records, production source materials, payroll records, current and potential AC accounts, lease and contracts with suppliers and accounts.    This information was requested in various e-mails in early 2007 from Costello to Bondaroff and never revealed to Costello.

111.    Despite abandoning his responsibilities to AC and locking Costello out of the AC office space, Bondaroff, without the prior knowledge or agreement from Costello, caused his $2,000 monthly rent for his apartment to be paid from AC's checking account.

112.    Costello made repeated attempts in e-mails to Bondaroff on March 30, 2007, April 2, 2007 and April 9, 2007 to obtain all AC files that were in Bondaroff's care, custody and control, including but not limited to stickers, ADP records and production books.    In the April 9, 2007 e-mail, Costello also requested that Bondaroff return the company color photocopier, valued at over ten thousand dollars.    Although Bondaroff ultimately returned the color photocopier and a small segment of AC's files, Bondaroff is still in possession of Costello's personal files, as well as many important company documents.    Upon information and belief, Bondaroff has withheld company documents and information in an attempt to financially harm Defendants.    Bondaroff's actions caused Defendants to incur expenses and expend more than 100 person hours in recreating sales records and other documents necessary for AC to continue operation.

113.    Upon Bondaroff's request, AC employed Shamara Bondaroff ("S.Bondaroff"), the sister of Bondaroff, as a personal assistant to Bondaroff and to provide office sales support to AC from in or about September 2006 through early 2007.    Among her responsibilities was the management of office files and keeping of corporate records, including payroll and sales records. After Bondaroff's unsuccessful attempt to push Costello out of AC, S.Bondaroff refused to provide Costello with the necessary information required for Costello to run the business.

114.    Costello e-mailed S.Bondaroff on February 4, 2007 and February 8, 2007 to obtain AC information pertaining to account receivables, AC order forms and the e-mail addresses of AC accounts that she had been withholding from Costello.    S.Bondaroff significantly delayed providing Costello with account information that was imperative to the operation of the business.

115.    On April 5, 2007, Costello e-mailed S.Bondaroff to request that she return a computer owned by AC.    This computer contains AC's financial records, including AC's QuickBooks accounting records.    S.Bondaroff advised Costello that she was giving it to Bondaroff.    Upon information and belief, Bondaroff is still in possession of AC's computer.

116.    Bondaroff continued to charge various personal expenses to the corporate AC credit card, such as to restaurants, Ikea, The Home Depot, and Circuit City, totaling in excess of $2,000 after he stopped any work for AC.    Additionally, Bondaroff charged numerous car rentals to AC, specifically a $500 a car rental fee in May 2007.    These charges were in excess of Bondaroff's $700 per week salary which had been discontinued when Bondaroff stopped working for AC and these charges were not agreed upon between Costello and Bondaroff.

**Bondaroff's Withdrawal from AC**

117.    Despite numerous acknowledgements by Bondaroff that he was a 50% owner of AC and after Bondaroff's failed attempt to force Costello out of the corporation, Bondaroff changed tactics entirely and in or about April 2007 falsely claimed for the first time that he was never an owner of AC and that he never assigned the aNYthing trademark to AC.

118.    Costello reminded Bondaroff that the trademark had been assigned to AC as an inducement to have Costello fund the retail outlet and that the corporate tax returns and other documents and correspondence, such as e-mails, press and client communication, clearly showed that Bondaroff was a 50% owner in AC.

119.    Despite the fact that Bondaroff knew that AC had previously filed an application for registration of the aNYthing mark, Bondaroff filed an application with the PTO on March 26, 2007 to register the aNYthing mark with his name as the owner of record.

**Bondaroff's Defamatory Statements**

120.    Upon information and belief, Bondaroff thereafter contacted customers and suppliers of AC and maliciously and without a basis in fact told them that AC had no right to use the aNYthing label, that Costello was trying to steal aNYthing, and that AC was going out of business.

121.    On April 12, 2007, Bondaroff contacted Samuel Spitzer ("Spitzer") at Splay/New York ("Splay"), the operator of AC's website, demanding that Splay cease and desist from its use of the aNYthing mark on AC's website, including the sale of products bearing the aNYthing mark because Bondaroff was the owner of the aNYthing mark.  Upon receipt of Bondaroff's letter, Splay shut down AC's website, as well as its e-mail server, preventing customers from

being able to purchase AC merchandise over the Internet.  At AC's request, Splay eventually reinstated AC's website and e-mail server.

122.    On June 25, 2007, Chris Gibbs ("Gibbs") of the AC account Union LA e-mailed AC to inform it that Gibbs would be returning two boxes of merchandise that he had received from AC.  Gibb's e-mail stated that the decision was based on his receipt of correspondence from Bondaroff.

123.    Costello received an e-mail on July 26, 2007 from Tom Korest ("Korest") at Vector Distribution ("Vector"), a printer for AC.  Korest informed Costello that Vector would no longer print for AC due to his hearing that AC was in a "legal battle".  Vector ceased doing business with AC since it stated it would "only work with stable companies," despite acknowledging that Costello "has never been anything but honest."  Vector refused to release AC goods in its possession until AC paid Vector in full, a change from the prior agreed upon terms that AC had net thirty days to pay fifty percent of the balance of the payment due.  Upon information and belief, Korest received this misinformation from communications with Bondaroff.

124.    Upon information and belief, Bondaroff contacted Greg at the AC account Situational Normal and wrongfully informed him that Costello had filed a trademark application in Costello's name and that Costello is trying to steal Bondaroff's mark.

125.    Upon information and belief, Bondaroff also contacted the AC account Goods and misinformed the account that AC was going out of business.

126.    Upon information and belief, Bondaroff has created a blog at the web address http://nyglob.com and entitled "The New York Glob," copying AC's blog, the "Glob," including

the design of the word "Glob." Bondaroff has posted various disparaging photographs and comments on his blog in reference to his dispute with AC and Costello after Bondaroff left AC.

127.    On or about April 27, 2007, Bondaroff posted a flyer on his blog for a party that he claimed was being promoted by aNYthing.  This same flyer was posted on aNYthing's website blog as a promotion for the party.  The party was in no way connected to, or promoted by aNYthing or AC.

128.    On June 24, 2007, Bondaroff created a post on his blog entitled "You Will Fail." The post contained the phrase "ain'tyerthing" in the same font as AC's mark "aNYthing."

129.    In a July 18, 2007 post to Bondaroff's blog, Bondaroff wrote: "Not available at the aNYthing Store..." and placed a line through the mark "aNYthing."

130.    In or about June 2007, a music album by the band "The Virgins" was released, containing the aNYthing mark on its cover.  Although at one point after AC's creation, Costello and Bondaroff discussed forming a music label, The Virgins' album was not produced by or associated with AC.  Upon information and belief, Bondaroff produced the album and placed the mark on the album cover and is receiving income from sales of the album.

131.    In or about July 2007, AC became aware that Nike sneakers were being sold by Bondaroff imprinted with the "aNYthing" trademark.  These sneakers were produced and sold without the authorization of AC.

## AS AND FOR A FIRST COUNTERCLAIM
### (Breach of contract by Bondaroff)

132.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "131" as if restated herein at length.

133.    In mid-2005, Costello and Bondaroff entered into an agreement whereby Bondaroff assigned all rights to the trademark aNYthing to AC and to be personally present at the retail store to promote the business of AC.

134.    Costello contributed an additional $500,000 in capital to AC in consideration of, and in reliance upon, Bondaroff's assignment of all rights to the trademark aNYthing and to personally be present to promote AC's business at the retail store.

135.    It was expressly agreed and understood between Bondaroff and Costello that Bondaroff would have no personal rights to the trademark aNYthing.

136.    It was also expressly agreed and understood that AC would have unconditional ownership and exclusive use of the trademark aNYthing, including, but not limited to, continuing to sell tee shirts, sweatshirts, hats and other merchandise under the aNYthing label and continuing to use the mark on the Hester Street retail space and on AC's website.

137.    Bondaroff breached the assignment agreement by: (1) failing to be present at the AC store and failing to promote AC's business from summer 2006 to the present; (2) contacting customers and suppliers of AC in early 2007 and maliciously and without a basis in fact telling them that AC had no right to use the aNYthing trademark; (3) falsely filing a U.S. Trademark Application as the record owner of the aNYthing mark with the PTO; (4) sending a cease and desist letter to Splay, AC's website operator; (5) using the aNYthing trademark on The Virgins' music album and on sneakers which were not produced by or associated with AC; and (6) promoting social events unconnected with AC from which Bondaroff was to make a profit.

138.    As a result of Bondaroff's breach of his agreement with Costello and AC, Defendants suffered damages and continue to suffer damages since: (1)  Customers have refused to purchase AC merchandise because Bondaroff mistakenly informed them that AC has no right

to use the aNYthing mark; (2) Suppliers have refused to work with AC because Bondaroff mistakenly informed them that AC has no right to use the aNYthing mark; (3) Defendants have incurred expenses concerning the breached transaction; and (4) Defendants have lost real and valuable business opportunities.

**AS AND FOR A SECOND COUNTERCLAIM**
**(Promissory Estoppel)**

139.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "138" as if restated herein at length.

140.    In mid-2005, Costello and Bondaroff entered into an agreement whereby Bondaroff agreed to assign all rights to the trademark aNYthing to AC and to be personally present at the retail store to promote the business of AC.

141.    It was expressly agreed and understood between Bondaroff and Costello that Bondaroff would have no personal rights to the trademark aNYthing.  It was also expressly agreed and understood that AC would have unconditional ownership and exclusive use of the trademark aNYthing, including, but not limited to, continuing to sell tee shirts, sweatshirts, hats and other merchandise under the aNYthing label and continuing to use the mark on the Hester Street retail space and on AC's website.

142.    Costello reasonably relied on Bondaroff's agreement to assign all rights to the trademark aNYthing to AC and contributed an additional $500,000 in capital to further develop and expand the AC brand and store.

143.    As a result of Costello's reasonable reliance on Bondaroff's agreement to assign all rights to the trademark aNYthing to AC, Costello suffered damages and continues to suffer damages since: (1)  Customers have refused to purchase AC merchandise because Bondaroff

falsely informed them that AC has no right to use the aNYthing mark; (2) Suppliers have refused to work with AC because Bondaroff falsely informed them that AC has no right to use the aNYthing mark; (3) Costello has incurred expenses concerning the breached agreement, specifically Costello's additional capital contribution; and (4) Defendants have lost real and valuable business opportunities.

**AS AND FOR A THIRD COUNTERCLAIM**
**(Breach of Fiduciary Duty)**

144. Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "143" as if restated herein at length.

145. Bondaroff and Costello were shareholders in AC, each with a 50% ownership in the corporation.

146. Bondaroff was also an officer of AC, acting as President in charge of promoting the brand and creating new products.

147. As a shareholder of AC, Bondaroff owed a fiduciary duty to Costello, the other shareholder of AC.

148. Additionally, as an officer of AC, Bondaroff owed a fiduciary duty to AC.

149. Bondaroff's conduct breached his fiduciary duties to Defendants. Bondaroff did not act in good faith or in the best interests of Defendants when after assigning the rights to the aNYthing mark to AC he: (1) contacted investors for the sole purpose of enriching Bondaroff at the expense of Costello; (2) contacted customers and suppliers of AC and maliciously and without a basis in fact told them that AC had no right to use the aNYthing trademark and that AC was going out of business; (3) falsely filed for registration as the record owner of the aNYthing mark with the PTO, two months after AC filed for registration of the mark; (4) disparaged

Defendants on his blog; (5) used the aNYthing trademark on The Virgins' music album and on sneakers which were not produced by or associated with AC; (6) sent Splay, AC's website operator, a letter demanding that Splay cease and desist from using the aNYthing mark on AC's website, essentially eliminating AC's opportunity to sell its merchandise on its website; (7) withheld essential business records and information that AC needed to run the company; and (8) starting in summer 2006, used time and resources of AC for his own gain by promoting his nightclub venture and failing to promote AC and the aNYthing store.

150.    As a result of Bondaroff's breach of his fiduciary duties to Defendants, Defendants suffered damages and continue to suffer damages since: (1) Customers have refused to purchase AC products; (2) Suppliers have refused to work with AC; (3) Defendants have incurred expenses and lost profits; and (4) Defendants have lost real and valuable business opportunities in an amount to be proved at trial.

151.    The intentional and malicious acts of Bondaroff, if unabated, will prevent Costello from recouping his capital investment of more than $600,000 and of enjoying the profits of his investment.

## AS AND FOR A FOURTH COUNTERCLAIM
### (False Designation of Origin of the aNYthing Mark in Violation of Section 43(a) of the Lanham Act)

152.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "151" as if restated herein at length.

153.    In mid-2005, Costello and Bondaroff entered into an agreement whereby Bondaroff agreed to assign and assigned all rights to the trademark aNYthing to AC.

154.    Costello contributed an additional $150,000 in capital to AC in consideration for Bondaroff's agreement to assign all rights to the trademark aNYthing.    Pursuant to this agreement, the aNYthing trademark was assigned to AC.

155.    Defendants filed for registration with the PTO of the aNYthing mark on January 18, 2007.  Bondaroff filed for registration with the PTO of the same mark on the later date of March 26, 2007.

156.    The mark, aNYthing, is a valid, distinctive mark.  AC uses the mark in commerce on long and short-sleeved tee shirts, sweatshirts, hats and other merchandise, as well as on AC's storefront and website.  Although the mark, aNYthing, is a common word, it is applied in an unfamiliar way to clothing and other merchandise sold in AC's store and website, and is an arbitrary trademark as applied to AC's goods and services sold under the aNYthing mark.

157.    The mark, aNYthing, has also acquired secondary meaning through the Defendants' use of the mark in interstate commerce since April 2004.  Sales in 2006 consisted of $550,000 in wholesale sales to sixty accounts, $240,000 in retail sales from the AC store and internet sales of $75,000, totaling $865,000.  As much of the apparel produced by AC bears the mark aNYthing with a distinctive graphic, the mark has become uniquely associated with AC such that the mark identifies the merchandise sold by AC. The aNYthing brand has also achieved wide notoriety in the press, specifically AC's cover story in the July 30, 2006 New York Times Magazine.

158.    Bondaroff's use of the distinctive mark, aNYthing, on his blog, as well as on The Virgins' music album cover and a product line of sneakers, is a false designation of origin and a false representation, and wrongfully and falsely designates the origin of Bondaroff's services and goods as originating or being associated and affiliated with AC in violation of Section 43(a) of

the Lanham Act. Bondaroff's use of the aNYthing mark on his blog, The Virgins' album cover, and the product line of sneakers is likely to cause confusion or mistake among consumers or those in the relevant trade and industry, or to deceive such persons as to the affiliation, connection, endorsement, sponsorship or association of Bondaroff's services and goods with AC's services and goods.

159.    Bondaroff's acts are intentional and willful and Defendants have been and are likely to be damaged by these acts.

## AS AND FOR A FIFTH COUNTERCLAIM
### (False Designation of Origin of the "Glob" mark in Violation of Section 43(a) of the Lanham Act)

160.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "159" as if restated herein at length.

161.    In 2006, AC started making internet sales through its website www.anewyorkthing.com. The website also contained a link to AC's blog known as the "Glob."

162.    The mark, Glob, is a valid, distinctive mark used on AC's website. Although the mark, Glob, is a common word, it is applied in an unfamiliar way to represent AC's blog on its website. The "Glob" is a forum for employees of AC to inform its customers of future events, as well as to share interesting stories, photographs and music that tend to support the aNYthing brand.

163.    The mark, Glob, has also acquired secondary meaning since its creation in 2006. The aNYthing brand has achieved wide notoriety in the press and sales in 2006 were $865,000, $75,000 of which were sales made on the internet. Accordingly, the Glob has become uniquely associated with AC such that the mark identifies AC's brand.

164.    Bondaroff's use of the Glob mark on his blog is a false designation of origin and a false representation, and wrongfully and falsely designates the origin of Bondaroff's services and goods as originating or being associated and affiliated with AC in violation of Section 43(a) of the Lanham Act.  Bondaroff's use of the Glob mark on his blog is likely to cause confusion or mistake among consumers or those in the relevant trade and industry, or to deceive such persons as to the affiliation, connection, endorsement, sponsorship or association of Bondaroff's services and goods with AC's services and goods.

165.    Bondaroff's acts are intentional and willful and Defendants have been and are likely to be damaged by these acts.

## AS AND FOR A SIXTH COUNTERCLAIM
### (Dilution in Violation of Section 43(c) of the Lanham Act and New York General Business Law § 360-l)

166.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "165" as if restated herein at length.

167.    The aNYthing mark has become uniquely associated with AC.

168.    The Glob mark has become uniquely associated with AC.

169.    Bondaroff has adopted marks nearly identical, if not identical, to the aNYthing and the Glob marks, in style, coloration, appearance and impression.

170.    Bondaroff has associated with the marks false and defamatory information, which has and will continue to tarnish the marks.  Specifically, Bondaroff has made disparaging comments about AC on his blog, The New York Glob, using the aNYthing mark with the intention to injure the good will and reputation of AC.

171.    Bondaroff's use of the marks has caused blurring, whereby the distinctiveness of the aNYthing mark has been weakened because AC's customers are no longer able to distinguish

- 28 -

the source of the mark. For instance, Bondaroff has placed the aNYthing mark on the cover of The Virgins' music album and on a product line of sneakers, each projects AC has no affiliation with and has not produced. In addition, Bondaroff placed the April 27, 2007 party flyer posting on his blog, confusing aNYthing's customers as to who is promoting the party, aNYthing or Bondaroff.

172.    Bondaroff has committed and, unless enjoined by this Court, will continue to commit the diluting acts alleged above in violation of Section 43(c) of the Lanham Act and the New York General Business Law § 360-l, with full knowledge of Defendants' rights to the marks and intentional disregard thereof.

173.    Bondaroff's acts have caused Defendants harm.

174.    Unless enjoined by this Court, Bondaroff's acts will continue to cause irreparable harm to the good will and reputation of AC for which there is no adequate remedy at law.

## AS AND FOR A SEVENTH COUNTERCLAIM
### (False or Misleading Representations of Fact in Violation of Section 43(a) of the Lanham Act)

175.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "174" as if restated herein at length.

176.    Bondaroff knowingly made statements to various AC customers and suppliers, falsely informing them that AC had no rights to use the aNYthing mark and that AC was going out of business.

177.    Upon information and belief, Bondaroff falsely broadcasted to Spitzer at Splay, Korest at Vector Distribution, and Greg at Situational Normal that AC no longer had rights to use the aNYthing mark.

178.    Bondaroff also published false and misleading statements on his blog, The New York Glob, on June 24, 2007 and July 18, 2007.  In the June 24, 2007 posting, Bondaroff posted the phrase "ain'tyerthing" in the same font as AC's mark "aNYthing," under the title "You Will Fail."  In the July 18, 2007 posting Bondaroff wrote: "Not available at the aNYthing store..." and placed a line through AC's mark "aNYthing."

179.    Upon information and belief, these literally false statements were used by Bondaroff to promote his personal ventures and as part of an organized campaign to penetrate the relevant market and harm AC's business.

180.    Bondaroff's promotion mispresented the nature and characteristics of AC's products, because Bondaroff expressed that AC had no rights to the aNYthing mark, that AC's branded merchandise was inauthentic, and that AC is illegally selling merchandise under the aNYthing mark.

181.    Bondaroff's false and misleading statements to AC's customers and suppliers of goods, as well as on his blog, violate Section 43(a) of the Lanham Act and have damaged AC and Costello by damaging their reputation in the business community and causing them to lose business.

## AS AND FOR AN EIGHTH COUNTERCLAIM
### (Defamation)

182.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "181" as if restated herein at length.

183.    Bondaroff knowingly made defamatory statements to various AC customers and suppliers, falsely informing them that AC had no rights to use the aNYthing mark and that AC was going out of business.

184.    Upon information and belief, Bondaroff falsely broadcasted to the AC account, Goods, that AC was going out of business.

185.    Upon information and belief, Bondaroff falsely broadcasted to Spitzer at Splay, Korest at Vector Distribution, and Greg at Situational Normal, that AC continued to use the aNYthing mark after it had no right to do so.

186.    These false statements injured the business reputation of AC and exposed Defendants to public ridicule because Bondaroff expressed that AC no longer has rights to the aNYthing mark, implying that AC is illegally continuing to sell its merchandise under the aNYthing mark.

187.    Bondaroff also published libelous statements on his blog, The New York Glob, on June 24, 2007 and July 18, 2007.  In the June 24, 2007 posting, Bondaroff posted the phrase "ain'tyerthing" in the same font as AC's mark "aNYthing," under the title "You Will Fail."  In the July 18, 2007 posting Bondaroff wrote:  "Not available at the aNYthing store..." and placed a line through AC's mark "aNYthing."

188.    These postings on Bondaroff's blog mock the aNYthing mark, injuring the business reputation of AC and exposing Defendants to public ridicule.

189.    Bondaroff's defamatory statements have damaged AC and Costello, causing them to lose business and by damaging their reputation in the business community.

## AS AND FOR A NINTH COUNTERCLAIM
### (Slander of Title)

190.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "189" as if restated herein at length.

191.    Bondaroff knowingly made false statements to various AC customers and suppliers, informing them that AC had no rights to use the aNYthing mark and that AC was going out of business.

192.    Upon information and belief, Bondaroff falsely communicated to Spitzer at Splay, Korest at Vector Distribution, and Greg at Situational Normal that AC no longer had rights to use the aNYthing mark.

193.    Bondaroff also published false and misleading statements on his blog, The New York Glob, on June 24, 2007 and July 18, 2007.  In the June 24, 2007 posting, Bondaroff posted the phrase "ain'tyerthing" in the same font as AC's mark "aNYthing," under the title "You Will Fail."  In the July 18, 2007 posting Bondaroff wrote:  "Not available at the aNYthing store..." and placed a line through AC's mark "aNYthing."

194.    Bondaroff's false and misleading statements to AC's customers and suppliers of goods, as well as on his blog, falsely cast doubt on AC's ownership of the aNYthing mark, and on its validity of AC's right to use the aNYthing mark, because Bondaroff expressed that AC had no rights to the aNYthing mark, that AC's branded merchandise was inauthentic, and that AC is illegally selling merchandise under the aNYthing mark.

195.    Upon information and belief, these false statements made by Bondaroff were reasonably calculated to cause AC to lose business and to damage Defendants' business reputation.

196.    Bondaroff's false and misleading statements to AC's customers and suppliers of goods, as well as on his blog, have damaged AC and Costello by damaging their reputation in the business community and causing them to lose business.

## AS AND FOR A TENTH COUNTERCLAIM
### (Product Disparagement)

197.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "196" as if restated herein at length.

198.    Bondaroff knowingly made false statements to various AC customers and suppliers, informing them that AC had no rights to use the aNYthing mark and that AC was going out of business.

199.    Upon information and belief, Bondaroff falsely broadcasted to Spitzer at Splay, Korest at Vector Distribution, and Greg at Situational Normal that AC no longer had rights to use the aNYthing mark.

200.    Bondaroff also published false and disparaging statements on his blog, The New York Glob, on June 24, 2007 and July 18, 2007. In the June 24, 2007 posting, Bondaroff posted the phrase "ain'tyerthing" in the same font as AC's mark "aNYthing," under the title "You Will Fail." In the July 18, 2007 posting Bondaroff wrote: "Not available at the aNYthing store..." and placed a line through AC's mark "aNYthing."

201.    Bondaroff's false and disparaging statements to AC's customers and suppliers of goods, as well as on his blog, falsely cast doubt on AC's ownership of the aNYthing mark, and on its validity of AC's right to use the aNYthing mark, because Bondaroff expressed that AC had no rights to the aNYthing mark, that AC's branded merchandise was inauthentic, and that AC is illegally selling merchandise under the aNYthing mark.

202.    Upon information and belief, these false statements made by Bondaroff were published with the malicious intent to cause AC to lose business and to damage Defendants' business reputation.

203.    Bondaroff's false and disparaging statements to AC's customers and suppliers of goods, as well as on his blog, have damaged AC and Costello by damaging their reputation in the business community and causing them to lose business.

## AS AND FOR AN ELEVENTH COUNTERCLAIM
### (Tortious Interference with Contract)

204.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "203" as if restated herein at length.

205.    Bondaroff, as President and shareholder of AC, was aware of AC's agreements with Union LA, Vector Distribution, Splay and other customers and suppliers of AC.

206.    Bondaroff, with the intent of interfering with those agreements and without justification, caused Union LA, Vector Distribution, Splay and other customers and suppliers of AC to breach their agreements with AC, by returning merchandise that the customers had agreed to sell in their stores, by refusing to continue to work with AC to produce its merchandise, and by shutting down AC's website and e-mail server.

207.    Bondaroff induced Union LA, Vector Distribution, Splay and other customers and suppliers of AC's breach of their agreements by wrongful means, including but not limited to Bondaroff's contacting customers and suppliers of AC and maliciously and without a basis in fact, telling them that AC had no right to continue to use the aNYthing trademark and that as a result, AC was going out of business.

208.    Upon information and belief, Bondaroff induced the breach so that AC would no longer be able to supply merchandise to its customers and would have to disband its operations.

209.    As a result of Bondaroff's conduct, Union LA, Vector Distribution, Splay and other customers and suppliers of AC breached their agreements, and Defendants suffered

damages since: (1) Defendants have had to find another printer to print AC's merchandise; (2) Defendants have incurred expenses concerning the breached transactions; and (3) Defendants have lost real and valuable business opportunities, from Union LA and other customers.

## AS AND FOR A TWELFTH COUNTERCLAIM
### (Tortious Interference with Business Relationships)

210.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "209" as if restated herein at length.

211.    Bondaroff, as President and shareholder of AC, was aware of AC's agreements with Union LA, Vector Distribution, Splay and other customers and suppliers of AC.

212.    Bondaroff was aware that AC had impending agreements with various customers and suppliers of AC, including Union LA, Vector Distribution and Splay.

213.    Bondaroff induced Union LA, Vector Distribution, Splay and other customers and suppliers of AC to breach their agreements by wrongful means, including but not limited to Bondaroff's contacting customers and suppliers of AC and maliciously and without a basis in fact, telling them that AC had no right to continue to use the trademark aNYthing and that as a result, AC was going out of business.

214.    Bondaroff, in early 2007, also withheld account information and company financial documents from Costello, preventing Costello from being able to contact current and potential new customers.

215.    Upon information and belief, Bondaroff tortiously interfered with these business relationships so that AC would no longer be able to supply merchandise to its customers and would have to disband its operations.

216.    As a result of Bondaroff's conduct, Union LA, Vector Distribution, Splay and other customers and suppliers of AC breached their agreements, and Defendants suffered damages since: (1) Defendants have had to find another printer to print AC's merchandise; (2) Defendants have incurred expenses concerning the breached transactions; and (3) Defendants have lost real and valuable business opportunities, from Union LA and other customers.

## AS AND FOR A THIRTEENTH COUNTERCLAIM
### (Breach of Shareholders' Agreement)

217.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "216" as if restated herein at length.

218.    It was agreed between Costello and Bondaroff that neither shareholder while owning shares in AC would directly or indirectly engage in the production, marketing and sale of products similar to those marketed and sold by AC, including clothing, sneakers and bed sheets. It was also agreed that neither shareholder would engage in the production and marketing of music, plays and/or motion pictures and the publishing and labeling of books, magazines, compositions or scripts.

219.    Costello and Bondaroff also agreed that if either shareholder sold their shares of AC that the former shareholder would not directly or indirectly engage in the production, marketing and sale of products similar to those marketed and sold by AC, including clothing, sneakers and bed sheets, for a period of two years.  It was agreed that neither shareholder would engage in the production and marketing of music, plays and/or motion pictures and the publishing and labeling of books, magazines, compositions or scripts for a period of two years.

220.    Bondaroff breached his agreement with Costello through the production of The Virgins' album and the marketing of a product line of sneakers, each containing the aNYthing mark without the authorization of AC.

221.    Bondaroff's acts in breach of the shareholder agreement have damaged Defendants in amounts to be proven at trial.

## AS AND FOR A FOURTEENTH COUNTERCLAIM
## (Unfair Competition in Violation of New York General Business Law § 360-l and Common Law)

222.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "221" as if restated herein at length.

223.    The aNYthing mark has become uniquely associated with AC.

224.    The Glob mark has become uniquely associated with AC.

225.    Bondaroff has adopted marks nearly identical, if not identical, to the aNYthing and the Glob marks, in style, coloration, appearance and impression.

226.    Bondaroff's conduct is likely to cause confusion as to the source of the aNYthing brand and who owns the rights to the aNYthing mark.

227.    Bondaroff willfully adopted the marks to deceive customers and suppliers, as well as to injure the reputation of AC.

228.    Bondaroff has associated with the marks false and defamatory information, which has and will continue to tarnish the marks.

229.    By his acts, Bondaroff has competed unfairly, causing Defendants harm.

## AS AND FOR A FIFTEENTH COUNTERCLAIM
### (Replevin)

230.     Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "229" as if restated herein at length.

231.     Costello made repeated attempts in e-mails to Bondaroff on March 30, 2007, April 2, 2007 and April 9, 2007 to obtain all AC files that were in Bondaroff's possession, including but not limited to stickers, ADP records and production books.  In the April 9, 2007 e-mail, Costello also requested that Bondaroff return the company color photocopier, valued at over ten thousand dollars.

232.     Costello e-mailed S.Bondaroff on March 16, 2007 to obtain AC information pertaining to account receivables, AC order forms and the e-mail addresses of AC accounts that she had been withholding.

233.     On April 5, 2007, Costello e-mailed S.Bondaroff to request that she return a computer owned by AC.  This computer contains AC's financial records, including AC's QuickBooks accounting records.

234.     Despite Costello's demand for Bondaroff to return AC's property, Bondaroff is still in possession and control of many files belonging to AC, including account information and financial records.  Additionally, upon information and belief Bondaroff is in possession of a computer belonging to AC.

235.     Defendants have been harmed by Bondaroff's failure to return AC's property because AC has lost the value of the computer, as well as had to operate the business without the essential documents.

## AS AND FOR A SIXTEENTH COUNTERCLAIM
### (Conversion)

236.    Defendants repeat and reallege each and every allegation contained in paragraphs "1" through "235" as if restated herein at length.

237.    Bondaroff, who had a corporate credit card, began charging personal expenses to the credit card without permission and over the objections of Costello.  Such purchases included restaurants, movie tickets, cable television bills, clothing, alcohol and rental cars in excess of $30,000.

238.    Even after Bondaroff abandoned AC in early 2007, he continues to charge personal expenses to AC's credit card without permission, such as to restaurants, Ikea, Hertz, The Home Depot and Circuit City, totaling more than $2,000.  Additionally, Bondaroff charged numerous unauthorized car rentals to AC, including a $500 car rental fee in May 2007.

239.    Bondaroff's charging of personal expenses to AC's credit card was intentional, without authorization and against his understanding with Costello.

240.    The credit card and the money used to pay Bondaroff's personal expenses belonged to AC.  Bondaroff continues to exercise control over the credit card and charge personal expenses to AC's account.  As a result, Defendants have been harmed in the amount of $33,212.37.

### DEMAND FOR A JURY TRIAL

241.    Defendants hereby demand a trial by jury on all issues so triable in this action.

**WHEREFORE**, Defendants request judgment:

(a)    Dismissing Bondaroff's complaint in its entirety;

(b)    Against Bondaroff awarding Defendants compensatory damages in an amount to be determined at trial, in an amount exceeding the jurisdictional

requirements of this court, together with pre-judgment and post-judgment interest, costs of suit and counsel fees;

(c)    Against Bondaroff awarding punitive damages in an amount to be determined at trial, in an amount not less than $5,000,000;

(d)    Ordering the immediate cessation of all use of the aNYthing mark by Bondaroff, immediate withdrawal of Bondaroff's application with the PTO and immediate cessation of engaging in the production and sale of music and sneakers by Bondaroff in violation of the shareholders' agreement;

(e)    The return of all AC documents and other property under the care, custody, or control of Bondaroff;

(f)    Awarding Defendants their costs incurred in this action including reasonable attorney's fees; and

(g)    Awarding Defendants such other and further relief as this Court deems just and proper.


Dated: New York, New York
       October 3, 2007


                              Respectfully submitted,

                              CLIFTON BUDD & DeMARIA, LLP


                              By: _____
                                    Robert J. Tracy (RT-5260)
                                    420 Lexington Avenue
                                    New York, New York 10170
                                    (212) 687-7410